William M. Audet (SBN 117456)
  waudet@audetlaw.com
"David" Ling Y. Kuang (SBN 296873)
  lkuang@audetlaw.com
Kurt D. Kessler (SBN 327334)
  kkessler@audetlaw.com
**AUDET & PARTNERS, LLP**
  711 Van Ness Avenue, Suite 500
  San Francisco, CA 94102-3275
  Telephone:   (415) 568-2555
  Facsimile:   (415) 568-2556

*Attorneys for Plaintiff Elvia Curiel-Ruth, on behalf*
*of herself and all others similarly situated*

[Additional Counsel on Signature Block]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELVIA CURIEL-RUTH, on behalf of herself and all others similarly situated, | Case No: |
| | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | **FOR:** |
| | **(1)** **VIOLATION OF SECTION 1 OF THE SHERMAN ACT;** |
| v. | **(2)** **VIOLATION OF SECTION 2 OF THE SHERMAN ACT;** |
| ROBINHOOD FINANCIAL LLC; ROBINHOOD SECURITIES, LLC; ROBINHOOD MARKETS, INC.; THE CHARLES SCHWAB CORPORATION; CHARLES SCHWAB & CO. INC.; TD AMERITRADE, INC.; WEBULL FINANCIAL LLC; E*TRADE FINANCIAL CORPORATION; INTERACTIVE BROKERS, LLC; CITADEL ENTERPRISE AMERICAS, LLC; and MELVIN CAPITAL MANAGEMENT LP, | **(3)** **RESTRAINT OF TRADE VIOLATION OF THE CARTWRIGHT ACT;** |
| | **(4)** **ATTEMPTED MONOPOLIZATION IN VIOLATION OF THE CARTWRIGHT ACT;** |
| | **(5)** **BREACH OF CONTRACT;** |
| | **(6)** **BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;** |
| | **(7)** **NEGLIGENCE PER SE;** |
| | **(8)** **NEGLIGENCE;** |
| | **(9)** **BREACH OF FIDUCIARY DUTY;** |
| | **(10)** **CONSTRUCTIVE FRAUD; and** |
| | **(11)** **VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW** |
| Defendants. | |
| | <u>**DEMAND FOR JURY TRIAL**</u> |

Plaintiff ELVIA CURIEL-RUTH (hereinafter Plaintiff) individually, and on behalf all others similarly situated (collectively "Plaintiffs"), bring this class action lawsuit (collectively "Plaintiffs"), bring this class action lawsuit against Defendants ROBINHOOD FINANCIAL LLC, ROBINHOOD SECURITIES, LLC, and ROBINHOOD MARKETS, INC. (together, "Robinhood"), Defendants THE CHARLES SCHWAB CORPORATION, CHARLES SCHWAB & CO. INC. (together, "Schwab"), Defendants TD AMERITRADE, INC. ("TDAmeritrade"), WEBULL FINANCIAL LLC ("Webull"), E*TRADE FINANCIAL CORPORATION ("ETrade"), INTERACTIVE BROKERS, LLC ("IB"), CITADEL ENTERPRISE AMERICAS, LLC ("Citadel"), and MELVIN CAPITAL MANAGEMENT LP ("Melvin"), (collectively with all other named defendants, "the Defendants" and together with Plaintiffs, "the Parties"). This class action lawsuit is based upon personal knowledge of the facts pertaining to themselves, and upon information and belief as to all other matters, and do hereby allege as follows:

## **NATURE OF THE ACTION**

1.      In late 2020, stocks for various companies began to fluctuate greatly, including the stocks for the company GameStop Corp. ("GME") and American Movie Company ("AMC"), which experienced an extreme downturn due to the COVID-19 pandemic's effect on consumer's abilities to show in-store and to attend theatres. GME and AMC began to dramatically rise when retail investors began buying the stock in January 2021.

2.      In a free and open market, stock prices are determined by the laws of supply and demand as purchasers and sellers bid and ask stock prices. As more investors buy a certain stock, and bid up the stock's prices, the market price for the stock rises. Conversely, as investors sell stock, the stock price is bid down and the market price for the stock declines.

3.      This rise was due in part to the efforts of individual investors using the services provided by Defendants, purchasing a stock they believed had value, in addition to efforts from retail investors originating online to combat the actions of hedge funds to short the stocks, who viewed GME, AMC and other similar stocks as a prime "short" target, or a stock to bet against to profit from as it fell. Various hedge funds had begun to "short" AMC, or borrowing and subsequently selling a

**CLASS ACTION COMPLAINT**

stock at a current price, and promising to buy the stock back from the lender at a later date, with the goal that the value of the stock falls, giving the short seller the difference between the initial value of the stock and the lower, current value of the stock in profit.

4.     This led to a later phenomenon known as a "short squeeze," where a stock that had been heavily shorted quickly jumps significantly higher, placing short sellers in great distress as they began to owe immense sums of money.

5.     This short squeeze benefited the aforementioned retail investors, who were reaping the gains of a stock shooting up at an incredible rate. However, the firms that were shorting GME, AMC and other stocks were soon in debt for billions as the stock continued to grow immensely along with their liability.

6.     Robinhood, Schwab, TDAmeritrade, Webull, ETrade, and IB (collectively, hereinafter the "Trading Platform Defendants") are online brokerage firms on which many retail investors invest, given its consumer-friendly label as a firm that allows open trading and does not charge fees.

7.     Trading Platform Defendants purposefully, willfully, and knowingly removed its users' ability to purchase certain stocks from its trading platform in the midst of the short squeeze, depriving retail investors of the ability to invest in the open-market and manipulating the open-market to artificially lower the price.

8.     Trading Platform Defendants' actions, along with other Defendants' conduct, harmed Plaintiffs.

## **THE PARTIES**

9.     Plaintiff ELVIA CURIEL-RUTH was and is a citizen of the State of California. Plaintiff resides in Los Angeles County.

10.     Defendant ROBINHOOD FINANCIAL LLC is a Delaware corporation with its principal place of business at 85 Willow Road, Menlo Park, California 94025. It is a wholly-owned subsidiary of ROBINHOOD MARKETS, INC. ROBINHOOD FINANCIAL LLC is registered as a broker-deal with the U.S. Securities & Exchange Commission ("SEC"). Defendant ROBINHOOD

**CLASS ACTION COMPLAINT**

FINANCIAL LLC acts as an introducing broker and has a clearing arrangement with its affiliate DEFENDANT ROBINHOOD SECURITIES, LLC.

11.     Defendant ROBINHOOD SECURITIES, LLC is a Delaware corporation with its principal place of business at 500 Colonial Center Parkway, Suite 100, Lake Mary, Florida 32746. It is a wholly owned subsidiary of Defendant ROBINHOOD MARKETS, INC. Defendant ROBINHOOD SECURITIES, LLC is registered as a broker-dealer with the SEC. Defendant ROBINHOOD FINANCIAL LLC acts as a clearing broker and clears trades introduced by its affiliate Defendant ROBINHOOD FINANCIAL.

12.     Defendant ROBINHOOD MARKETS, INC. is a Delaware corporation with its principal place of business at 85 Willow Road, Menlo Park, California 94025. Defendant ROBINHOOD MARKETS, INC. is the corporate parent of Defendants ROBINHOOD FINANCIAL LLC and ROBINHOOD SECURITIES, LLC.

13.     The above-named corporate defendants herein are referred to collectively as "Robinhood."

14.     Defendant THE CHARLES SCHWAB CORPORATION is a Delaware corporation with its principal place of business at 211 Main Street, San Francisco, CA 94105.

15.     Defendant CHARLES SCHWAB & CO. INC. is a California corporation with its principal place of business at 211 Main Street, San Francisco, CA 94105.

16.     The two above-named corporate defendants herein are referred to collectively as "Schwab."

17.     Defendant TD AMERITRADE, INC. ("TD Ameritrade"), is a New York corporation with its principal place of business registered in Illinois, but is not in good standing.

18.     As of October 2020, The Charles Schwab Corporation acquired TD Ameritrade.

19.     WEBULL FINANCIAL LLC ("Webull") is a Delaware corporation with headquartered at 44 Wall St, New York, New York, 10005-2450.

20.     E*TRADE FINANCIAL CORPORATION ("ETrade") is a Delaware corporation with its principal place of business at 671 N. Glebe Road, Arlington, Virginia, 22203.

**CLASS ACTION COMPLAINT**

21.     INTERACTIVE BROKERS, LLC ("IB") is a Delaware corporation headquartered at One Pickwick Plaza, Greenwich, CT 06830.

22.     Defendant CITADEL ENTERPRISE AMERICAS, LLC ("Citadel") is a Delaware corporation with its principal place of business at 131 South Dearborn Street, Chicago, IL 60603. Defendant Citadel is the largest customer of Robinhood.

23.     Defendant MELVIN CAPITAL MANAGEMENT LP ("Melvin") is a Delaware corporation with its principal place of business at 535 Madison Avenue, 22nd Floor, New York, New York, 10022. Defendant Citadel is a hedge fund that owns Defendant Melvin.

24.     Each of the Defendants had actual and/or constructive knowledge of the acts of the other Defendants as described herein, and ratified, approved, joined in, acquiesced in, and/or authorized the acts of the other, and/or retained the benefits of the said acts.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction over the claims asserted herein pursuant to the Class Action Fairness Act, 28 U.S.C. §1332(d)(2), since some of the members of the Proposed Class (defined *infra*) are citizens of a State different from that of the Defendant and, upon the original filing of this Complaint, members of the putative class resided in states around the country; there are more than 100 putative class members; and the amount in controversy exceeds $5 million, exclusive of interest and costs.

26.     The Court also has personal jurisdiction over the parties because Defendants conduct a major part of their national operations, advertising, and sales through continuous business activity in this District.

27.     Venue is further appropriate pursuant to 28 U.S.C. §1391 because Defendants conduct a large amount of their business in this District, because they have specifically marketed, advertised, and made substantial sales in California, and because Defendants have substantial relationships in this District. Venue is also proper in this Court because a substantial part of the events and actions giving rise to the harm suffered by members of the Proposed Class occurred in this District.

4

1

## **FACTUAL ALLEGATIONS**

2

### **I.     Rise of Online, Commission-Free Trading**

3       28.     Robinhood is an online brokerage firm. Its users place securities trades through the

4   firm's website, by using a web-based application (or "app"). Robinhood permits users to purchase and

5   sell securities, including futures contracts.

6       29.     Robinhood was founded in 2013 and launched as a product 2015, and soon grew

7   immensely because it pioneered commission-free trading for stocks – or trading stocks for no charge.

8       30.     Many other brokerages (traditional and online) soon followed in Robinhood's steps to

9   allow for commission-free trading of stocks, including the other named Trading Platform Defendants

10  herein, as well as other market share leaders like Vanguard.

11      31.     Robinhood has experienced significant growth as a relatively new online brokerage

12  firm. In 2019, Robinhood raised $323 million in funding at a $7.6 billion valuation. The firm markets

13  itself primarily to younger investors and claims over 10 million users of its trading app.

14      32.     On or about March 23, 2016, Robinhood's official Twitter account stated: "Let the

15  people trade."[1]

16      33.     Robinhood's mission statement "is to democratize finance for all. We believe that

17  everyone should have access to the financial markets, so we've built Robinhood from the ground up

18  to make investing friendly, approachable, and understandable for newcomers and experts alike."[2]

19      34.     While Robinhood makes its users sign a "Customer Agreement" – the stock traders on

20  Robinhood are not its customers, but its product. Robinhood does not charge for trades, but instead

21  sells trades to "market makers" or firms such as Defendant Citadel (Robinhood's largest customer)

22  who act as middleman and make a profit on this transaction. Simply put – Robinhood's customers are

23  financial firms, and the users are the product.[3]

24  _____

25  [1] @RobinhoodApp, Twitter Post, Twitter (March 23, 2016) available at
    https://twitter.com/RobinhoodApp/status/712708069369782272

26  [2] Robinhood, Our Mission, (January 28, 2021), available at
    https://robinhood.com/us/en/support/articles/our-mission/

27  [3] Edward Ongweso Jr., *Robinhood's Customers Are Hedge Funds Like Citadel, Its Users Are Its
    Products*, Vice News (January 28, 2021), available at

28  https://www.vice.com/en/article/qjpnz5/robinhoods-customers-are-hedge-funds-like-citadel-its-users-
    are-the-product

**CLASS ACTION COMPLAINT**

35.     Many of the Defendants represented to Plaintiffs that they were offering free brokerage services to facilitate fair trading in the stock market.

**II.      The Rise of GME/AMC**

36.     In its final quarterly filing of 2020, Defendant Melvin, one of the best performing hedge funds in recent years, revealed that it had a substantial short interest in GME, or that it was in position to profit if GME fell.[4]

37.     Retail investors took note of this, and realizing its potential, began to invest heavily in GME.

38.     Subsequently, in the latter stages of 2020 and January 2021, GME began to rise, from an individual value of about $17 per share to a peak value of nearly $500 per share. Throughout this time, Robinhood allowed retail investors to trade GME on the open market.

39.     In January of 2021, AMC stock also rose steadily, gaining nearly 50% in the first 3 weeks of the year.

40.     After news broke that AMC was also one of Wall Street's most shorted stocks, retail investors began to invest heavily in AMC, shooting it up 360% overnight to a value of $20.36 per share. Within an hour into the trading day, more than 500 million shares of AMC had changed hands – compared to a 30-day average volume of 86 million shares today. By the end of the trading day, more than 1.1 billion shares of AMC had changed hands.[5]

41.     On January 14, 2021, the "short squeeze" came to a head, with purchases by both retail investors and firms looking to short GME sent the stock soaring 27 percent.[6]

---

[4] Juliet Chung, *Short Bets Pummel Hot Hedge Fund Melvin Capital*, Wall Street Journal (January 22, 2021), available at  https://www.wsj.com/articles/short-bets-pummel-hot-hedge-fund-melvin-capital-11611349217
[5]  https://www.cnbc.com/2021/01/27/amc-shares-triple-as-retail-investor-raid-of-hedge-fund-short-targets-spreads-from-gamestop.html
[6] David Ingram & Jason Abbruzzese, *Robinhood and Reddit: A timeline of two apps tormenting Wall Street*, NBC News (January 28, 2021), available at  https://www.nbcnews.com/tech/tech-news/robinhood-reddit-timeline-two-apps-tormenting-wall-street-n1256080

**CLASS ACTION COMPLAINT**

42.     On January 19, 2021, a major short-selling investment firm known as Citron Research tweeted that the retail investors backing GME were "suckers" and that the short sellers would prevail, enraging the retail investors and giving them new motivation.[7]

43.     On January 22, 2021, trading was halted as the stock soared by more than 70 percent.[8] At the close of trading that day, the stock was at $64.75.

44.     Before trading, billionaire Chamath Palihapitiya showed support for the movement of retail investors, joining them by buying $125,000 in call options for GME, further displaying the legitimacy of the rise.[9]

45.     This rise was distributing wealth to smaller, retailer investors away from the hands of hedge funds and massive Wall Street firms that were losing money in droves as the stocks they had shorted continued to rise.

46.     CNBC's Jim Cramer, a financial markets pundit, noted the success of the online retail investors and praised them, saying "It's incredible to watch. I think they're succeeding beyond their wildest dreams." Cramer noted that they were crushing the short holdings from the major firms and profiting at their expense.[10]

47.     On Monday, January 25th, AMC announced that it had raised $917 million in capital to see it through the pandemic.[11] This news led to a 26% jump on the 25th and a 12 percent jump on the 26th.

---

[7] @CitronResearch, Twitter Post, Twitter (January 19, 2021), available at https://twitter.com/CitronResearch/status/1351544479547760642
[8] Kim Lyons, *GameStop stock halts trading after Reddit drama*, The Verge (January 22, 2021), available at https://www.theverge.com/2021/1/22/22244900/game-stop-stock-halted-trading-volatility
[9] Matthew Fox, *Chamath Palihapitiya follows Reddit investors into GameStop with purchase of bullish options that start paying out if the stock soars another 28%*, Markets Insider (January 26, 2021), available at https://markets.businessinsider.com/news/stocks/chamath-palihapitiya-gamestop-investment-buys-115-call-options-reddit-wallstreetbets-2021-1-1030005801
[10] https://www.cnbc.com/2021/01/14/jim-cramer-gamestop-bed-bath-beyond-are-surging-on-short-busting.html
[11] https://www.businesswire.com/news/home/20210125005273/en/AMC-Raises-917-Million-of-Fresh-Investment-Capital-Since-Mid-December-of-2020

7

48.     On January 26, 2021, the stock rose 92.7 percent, with a tweet by richest man in the world Elon Musk leading to the stock exceeding $200 after hours.[12]

49.     Defendant Melvin received a $2.8 billion bailout after the precipitous rise of some of the stocks on January 26.

50.     One firm that bailed out Defendant Melvin, to the tune of $2 billion, was Defendant Citadel, the aforementioned biggest customer of Robinhood.

51.     On January 27, 2021, the stock began trading at $351, up a staggering $200 from market close on the 26th, with the world beginning to take notice of the immense rate at which the stock was gaining value, gains that were driven by retail investors. This surge was the result of retail investors that "have beaten Wall Street at its own game", a win for the common man against the overwhelming infrastructure on Wall Street and its billion-dollar hedge funds. The retail investors knew that it was their presence in purchasing GME stock "en masse" that kept it rising despite the short presence against it.[13]

52.     Throughout the dramatic rise of GME, AMC, and other stocks, retail investors continuously complained of delays in trades or outages in the service, making them unable to execute trades at the precise time and price they desired.

**III.     Thursday, January 28th**

53.     Rather than use their financial acumen to compete and invest in good opportunities in the market to recoup the loss in their short positions due to the growth of the stocks they had shorted, or by paying the price for their bad bets, Defendants instead hatched an anticompetitive scheme to limit trading in stock.

54.     After the market closed on January 27, 2021, after-hours trading revealed suspicious coordinated trading activity. After-hours trading is not permitted for individual retail investors, but only for institutional investors such as hedge funds.

---

[12] Allison Morrow, *Elon Musk tweet fuels frenzied GameStop surge*, CNN (January 28, 2021), available at https://www.cnn.com/2021/01/26/investing/gamestop-stock-elon-musk-reddit/index.html
[13] Alicia Adamczyk, *'You will lose your money very, very quickly': What investors need to know about GameStop's stock surge*, CNBC (January 27, 2021), available at https://www.cnbc.com/2021/01/27/what-to-know-about-gamestops-stock-spike.html

**CLASS ACTION COMPLAINT**

55.     Analytics revealed a significant volume of GME short trading immediately prior to the markets opening on January 28, i.e., after-hours traders were taking more short positions suggesting after-hour traders were training in anticipation of a GME sell-off.

56.     As articulated above, retail investors cannot engage in after-hours trading, so the increase in short volume is likely the result of institutional investors taking short positions, such as Defendants Melvin and Citadel.

57.     The dramatic increase in short positions was counterintuitive. Chatter in various financial online forums indicated high excitement and motivation on the part of retail investors to continue investing – with a desire to see them go "to the moon". The retail investors announced plans to buy – which would mean the prices were likely to go up, not down.

58.     On or about the morning of January 28, 2021, in order to slow the growth of AMC and deprive their users of the ability to use their service, Robinhood abruptly, purposefully, willfully, and knowingly pulled GME and AMC from their app.[14]

59.     Also on January 28, TDAmeritrade placed restrictions on the trading of GME, AMC, and other securities on its platforms.[15]

60.     Also on January 28, Webull blocked GME and AMC trades on their platform despite being suggested as the more open alternative to Robinhood.[16]

61.     Also on January 28, IB restricted trading in GME and AMC, among other stocks.[17]

---

[14] Robinhood, *Keeping Customers Informed Through Market Volatility*, (January 28, 2021), available at https://blog.robinhood.com/news/2021/1/28/keeping-customers-informed-through-market-volatility

[15] ThinkAdvisor, *Schwab, TD Ameritrade Put Brakes on Some GameStop Trading*, (January 28, 2021), available at https://www.thinkadvisor.com/2021/01/28/schwab-td-ameritrade-put-brakes-on-some-gamestop-trading/

[16] Newsweek, *Webull Follows Robinhood in Blocking GameStop, AMC Trades After Being Suggested as Alternate Trading Platform*, (January 28, 2021), available at https://www.newsweek.com/webull-blocks-gamestop-amc-transactions-stock-market-robinhood-1565172

[17] CNBC, *Interactive Brokers restricted GameStop trading to protect the market, says Chairman Peterffy*, (January 28, 2021), available at https://www.cnbc.com/2021/01/28/interactive-brokers-restricted-gamestop-trading-to-protect-the-market-says-chairman-peterffy.html

9

**CLASS ACTION COMPLAINT**

62.     Also on January 28, ETrade halted trading in GME and AMC, preventing users from purchasing stock. [18]

63.     This led to a massive fall in AMC, as despite soaring as much as 570% over the course of the week, AMC fell by 55% after the Trading Platform Defendants restricted their users' ability to purchase new AMC stock.[19]

64.     By restricting their users from purchasing, there were suddenly more sellers than buyers, and various stocks fell.

65.     Upon doing so, there was bipartisan outcry from across the country as it was seen as a sign of market manipulation that Robinhood and the rest of the Trading Platform Defendants were restricting its users from purchasing new stock.

66.     Representative Rashida Tlaib, Congresswoman from Michigan, said that "This is beyond absurd. @FSCDems need to have a hearing on Robinhood's market manipulation. They're blocking the ability to trade to protect Wall St. hedge funds, stealing millions of dollars from their users to protect people who've used the stock market as a casino for decades."[20]

67.     Representative Alexandria Ocasio-Cortez, Congresswoman from New York, tweeted that "This is unacceptable. We now need to know more about @RobinhoodApp 's decision to block retail investors from purchasing stock while hedge funds are freely able to trade the stock as they see fit. As a member of the Financial Services Cmte, I'd support a hearing if necessary.", to which Senator Ted Cruz of Texas indicated his support.[21]

---

[18] The Verge, *E-Trade confirms it halted GameStop and AMC stock, will let you buy some Friday*, (January 28, 2021), available at https://www.theverge.com/2021/1/28/22254863/etrade-gamestop-amc-stock-reddit-wallstreetbets-robinhood.

[19] https://www.forbes.com/sites/jonathanponciano/2021/01/28/meme-stocks-begin-to-crumble-gamestop-market-value-falls-14-billion-amc-crashes-55-while-dow-jumps-600-points/?sh=4b3d8b2f4283

[20] @RashidaTlaib, Twitter Post, Twitter (January 28, 2021), available at https://twitter.com/RashidaTlaib/status/1354807292667981828?s=20

[21] @AOC, Twitter Post, Twitter (January 28, 2021), available at https://twitter.com/AOC/status/1354830697459032066

**CLASS ACTION COMPLAINT**

68.     Committees in both houses of Congress published that they will be holding hearings on the stock market after Robinhood and the rest of the Trading Platform Defendants restricted trading.[22]

69.     The New York Attorney General's office published that they would be looking into Robinhood and activity on the app in relation to AMC and other stocks.[23]

70.     The SEC asserted that they would "closely review actions taken by regulated entities that may disadvantage investors or otherwise unduly inhibit their ability to trade certain securities" and "act to protect retail investors when the facts demonstrate abusive or manipulative trading activity that is prohibited by the federal securities laws."[24]

71.     On January 29, 2021, while ostensibly reinstating the purchases of previously restricted securities, upon information and belief, Trading Platform Defendants in fact continued to limit the purchase of fractional shares and only allowed a maximum of one share to be purchased.

72.     Upon information and belief, Trading Platform Defendants' actions were done purposefully and knowingly to manipulate the market for the benefit of people and financial intuitions who were not Trading Platform Defendants' users.

73.     Since pulling the stock from their app, GME prices have gone up from a low point of approximately $120, with the stock ending the trading day at $193 and shooting up to over $340 in after hours trading, depriving investors of potential gains.

74.     Since pulling the stock from their app, AMC prices have gone up from a low point of approximately $7.51, with the stock ending the trading day at $8.68 and shooting up to over $14 in after-hours trading, depriving investors of potential gains.

---

[22] David Shepardson, *U.S. Congress to hold hearings on GameStop trading, state of stock markets*, Reuters (January 28, 2021), available at https://www.reuters.com/article/us-retail-trading-usa-congress/u-s-congress-to-hold-hearings-on-gamestop-trading-state-of-stock-markets-idUSKBN29X33T

[23] New York State Attorney General Press Release, *Attorney General James Reviewing Robinhood App Activity*, (January 28, 2019), available at https://ag.ny.gov/press-release/2021/attorney-general-james-reviewing-robinhood-app-activity

[24] Securities And Exchange Commission Public Statement, *Statement of Acting Chair Lee and Commissioners Peirce, Roisman, and Crenshaw Regarding Recent Market Volatility*, (January 29, 2021), available at https://www.sec.gov/news/public-statement/joint-statement-market-volatility-2021-01-29

**CLASS ACTION COMPLAINT**

75.     In sum, Trading Platform Defendants have restricted retailer investors from purchasing stock in their services for no legitimate reason, depriving retailer investors from full use and enjoyment of the Trading Platform Defendants' services to purchase securities.

76.     The Financial Industry Regulatory Authority ("FINRA"), which governs brokers like Robinhood, espouses rule 5310 regarding "Best Execution and Interpositioning." Rule 5310.01 requires that brokers, such as Robinhood "must make every effort to execute a marketable customer order that it receives promptly and fully." By failing to respond at all to users that have placed timely trades on its app, in addition to completely preventing users from even attempting trades at all, Robinhood has breached its obligations under FINRA § 5310.01 and caused its users substantial losses.

77.     Trading Platform Defendants continues to arbitrarily pull other securities, such as GameStop, AMC American Airlines, Blackberry, Bed Bath & Beyond, Castor Maritime, Express, Koss Corporation, Naked Brand Group, Nokia, Sundial Growers, Tootsie Roll, and Trivago ("Additional Stocks") from their services for the same illegitimate reason.

78.     Upon information and belief, Trading Platform Defendants are pulling securities like AMC and Additional Stocks from its platform in order to slow the growth of stocks and help institutional investors and firms with a connection to Trading Platform Defendants' revenue stream, such as Defendant Citadel, at the expense of Trading Platform Defendants' devoted base of retail investors. Simply put, Trading Platform Defendants are helping their corporate and financial firm customers (Defendants Melvin and Citadel), not its retail end-users. Robinhood reported raising a $1 billion dollar financing round from institutional investors in the midst of the foregoing debacle.

79.     The extent and scope of the conspiracy is still as of yet unknown. Plaintiffs believe the anticompetitive scheme is ongoing. In the evening of January 29, 2021, Defendant Robinhood announced it was increasing the number of restricted stocks from 13 to 50.

80.     Plaintiff owns shares in AMC, BB and Nokia. Plaintiff's share purchases were purchased through another outfit. Trading Platform Defendants' coordination to exclude users of their platforms to purchase these same shares damaged the property interests of Plaintiff, artificially

**CLASS ACTION COMPLAINT**

1  preventing the stocks from rising and actually leading to their decline, directly lowering the value of
2  Plaintiff's investments.

3      81.     Thus, Plaintiff, like so many other retail investors, lost out on earning opportunities.
4  The Class lost its opportunity to buy shares of those same stocks and others through the trading
5  services offered by Trading Platform Defendants.

6

7                                **CLASS ACTION ALLEGATIONS**

8      82.     Plaintiff brings claims pursuant to Federal Rule of Civil Procedure 23(a), (b)(2), (b)(3),
9  (c)(4), on behalf of the following Class, defined as:

10  **All persons or entities within the United States who, through a Trading Platform**
   **Defendant or another retail brokerage company, directly purchased securities of AMC**
11  **Entertainment Holdings Inc. (AMC), American Airlines Group Inc. (AAL), BlackBerry**
   **Ltd. (BB), Bed Bath & Beyond Inc. (BBBY), Castor Maritime, Inc. (CTRM), Express,**
12  **Inc. (EXPR), GameStop Corp. (GME), Koss Corporation (KOSS), Naked Brand Group**
   **Ltd. (NAKD), Nokia Corp. (NOK), Sundial Growers Inc. (SNDL), Tootsie Roll**
13  **Industries, Inc. (TR), or Trivago N.V. (TRVG) between January 1, 2021 to and until**
   **anticompetitive effects of Defendants' unlawful conduct ceases ("the Class Period).**
14

15      83.     Excluded from the Class and Subclass(es) are the Defendants' entities and their current
16  employees, counsel for either party, as well as the Court, its personnel presiding over this action, their
17  immediate family members, and governmental entities.

18      84.     This action has been brought and may properly be maintained as a class action against
19  Defendants pursuant to the provisions of Federal Rule of Civil Procedure 23.

20      85.     **Numerosity:** The precise number of members of the proposed Class is unknown to
21  Plaintiff at this time, but, based on information and belief, Class members are so numerous that their
22  individual joinder herein is impracticable. Based on information and belief and publicly available
23  reports, Class members number in the hundreds of thousands if not millions. Subclass members are
24  likely in the thousands. All Class and Subclass members may be notified of the pendency of this
25  action by reference to Defendants' records, or by other alternative means.

26      86.     **Commonality:** Numerous questions of law or fact are common to the claims of
27  Plaintiff and members of the proposed Class. These common questions of law and fact exist as to all
28

Class members and predominate over questions affecting only individual Class members. These common legal and factual questions include, but are not limited to the following:

    a.   Whether Trading Platform Defendants knowingly failed to provide the financial services that were needed to handle reasonable consumer demand in high-volume trading times, including trading securities that are available on every other competitive trading platform;

    b.   Whether Trading Platform Defendants failed to uphold its duty of care to its users when it purposefully restricted purchases of AMC and Additional Stocks on their services;

    c.   Whether Defendants restricted purchases of AMC and Additional Stocks purposefully or at the direction of others to benefit the finances of those it is associated with (Defendants Melvin and Citadel) at the expense of holders of AMC stock and Additional Stocks, many of which are Defendants' users;

    d.   Whether Defendants violated FINRA § 5310, alongside numerous other FINRA rules, state laws, and federal regulations;

    e.   Whether Trading Platform Defendants violated consumer protection laws in failing to disclose to its users that the services it advertised as open would not include the ability for Trading Platform Defendants to arbitrarily restrict the purchasing of certain securities;

    f.   Whether Trading Platform Defendants were in breach of its legal, regulatory, and licensing requirements by failing to provide adequate access to financial services;

    g.   Whether Trading Platform Defendants was in breach of its contracts and/or the implied covenant of good faith and fair dealing in connection with its failure to provide financial services;

    h.   Whether Trading Platform Defendants was negligent or grossly negligent by failing to provide financial services in a timely manner;

    i.   Whether Trading Platform Defendants breached its fiduciary duty to its users by failing to provide adequate access to financial services;

**CLASS ACTION COMPLAINT**

j.   Whether Defendants was unjustly enriched by its conduct prohibiting its users from purchasing AMC stock and Additional Stocks and from artificially limiting the purchases of AMC stock and Additional Stocks by the overall market;

k.   Whether and to what extent Plaintiffs were injured by Defendants' conduct and the appropriate class-wide measure of damages, restitution, and other appropriate relief, including injunctive relief; and

l.   Whether Plaintiffs are entitled to injunctive and declaratory relief.

87.   **Typicality:** The claims of the named Plaintiff are typical of the claims of the proposed Class in that the named Plaintiff was a user of Trading Platform Defendants' trading services during the class period and was unable to purchase AMC and Additional Stocks and make time-sensitive trades on AMC and Additional Stocks and thus sustained damages as a result of Trading Platform Defendants' wrongful conduct in restricting the purchase of AMC and Additional Stocks.

88.   **Adequate Representation:** Plaintiff will fairly and adequately represent the interests of the Class in that he has no conflicts with any other Class members. Plaintiff has retained competent counsel experienced in prosecuting complex class actions in federal court, including those involving financial services, and they will vigorously litigate this class action on his behalf and on behalf of the class.

89.   **Predominance and Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. A class action is superior to other available means, if any, for the fair and efficient adjudication of this controversy. Prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the Defendant. Additionally, given the relatively modest damages sustained by most individual Class members, few, if any, proposed Class members could or would sustain the economic burden of pursuing individual remedies for Defendants' wrongful conduct. Treatment as a class action will achieve substantial economies of time, effort, and expense, and provide comprehensive and uniform supervision by a single court. This class action presents no material difficulties in management.

**CLASS ACTION COMPLAINT**

90.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. A class action will permit an orderly and expeditious administration of the claims of the Class, will foster economies of time, effort, and expense, and will insure uniformity of decisions. The prosecution of individual actions by Class members would create the risk of (a) inconsistent or varying adjudications with respect to individual Class members; and (b) be grossly impracticable because the cost of vindicating an individual Class member's claim would likely exceed the value of the claim.

91.     Class action certification is warranted under Fed. R. Civ P. 23(b)(1)(A) because the prosecution of separate actions by individual members of the proposed Class would create a risk of inconsistent or varying adjudications with respect to individual Class members, which may produce incompatible standards of conduct for Defendants. 34. Class action certification is warranted under Fed. R. Civ P. 23(b)(1)(B) because the prosecution of separate actions by individual members of the proposed Class would create a risk of adjudications with respect to individual Class members which may, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

92.     The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) are met as Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making final injunctive, declaratory, or equitable relief appropriate with respect to the Class as a whole. Class action certification is also warranted under Fed. R. Civ P. 23(b)(3) because questions of law or fact common to the Class members predominate over any questions affecting only individual members, and a Class action is superior to other available remedies for the fair and efficient adjudication of this controversy.

93.     The number of damages available to the individual Plaintiff is insufficient to make litigation addressing Defendants' conduct economically feasible for most in the absence of the class action procedure. Individualized litigation also presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case. By contrast, the class action device presents far fewer

**CLASS ACTION COMPLAINT**

management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

94.     Class action certification is also warranted under Fed. R. Civ P. 23(c)(4) because questions of law or fact common to the Class members may be certified and decided by this Court on a class wide basis.

## CAUSES OF ACTION

### Count I

**Unlawful Combination and Conspiracy in Restraint of Trade in**

**Violation of Section 1 of the Sherman Act**

**15 U.S.C. § 1**

**(Against All Defendants)**

95.     Plaintiffs re-allege and incorporate by reference the factual allegations set forth above.

96.     On information and belief, the Defendants combined, conspired, or contracted to contemporaneously decide upon and enact a coordinated prohibition on the purchase of shares of GME, AMC, and Additional Stocks by Plaintiffs Class.

97.     The Trading Platform Defendants have prohibited and continue to prohibit purchases of shares of GME, AMC, and Additional Stocks by Plaintiffs in an unreasonable restraint of trade in the stock market. Despite prohibiting purchases, the Trading Platform Defendants have continued to allow Plaintiffs to sell their shares.

98.     As a result of Defendants' contract, combination, or conspiracy, the unreasonable restraint of trade in the stock market has caused injury to Plaintiffs by prohibiting their purchase of shares of GME, AMC, and Additional Stocks. Despite this prohibition, Trading Platform Defendants allow Plaintiffs to sell shares on their Platforms.

### Count II

**Attempted Monopolization of the Stock Market in**

**Violation of Section 2 of the Sherman Act**

**15 U.S.C. § 2**

**CLASS ACTION COMPLAINT**

**(Against All Defendants)**

99.    Plaintiffs re-allege and incorporate by reference the factual allegations set forth above.

100.    By prohibiting Plaintiffs from purchasing the Stocks but not from selling the Stocks, Trading Platform Defendants engaged in and continue to engage in exclusionary conduct that is deleterious to consumers and to the anticompetitive benefit of the Trading Platform Defendants. Trading Platform Defendants engaged in and continue to engage in anticompetitive conduct.

101.    Through the continued anticompetitive conduct of excluding Plaintiffs from the stock market as competitors by prohibiting Plaintiffs purchase of the Stocks, Trading Platform Defendants manifested and continue to manifest a specific intent to monopolize. Trading Platform Defendants' coordinated prohibition of Plaintiffs' purchase of the Stocks demonstrates Defendants' specific intent to monopolize the stock market.

102.    Upon information and belief, the Trading Platform Defendants collectively control a majority share of trading within the stock market. Trading Platform Defendants' coordinated prohibition of Plaintiff's purchase of the Stocks is likely to increase Trading Platform Defendants' market share within the stock market. As a result, Trading Platform Defendants' anticompetitive conduct poses a dangerous probability of achieving monopoly.

## Count III

### Restraint of Trade in Violation of the Cartwright Act

**(Bus. & Prof. Code 16720 *et seq*.)**

**(Against All Defendants)**

103.    Plaintiffs re-allege and incorporate by reference the factual allegations set forth above.

104.    On information and belief, the Defendants combined, conspired, or contracted to contemporaneously decide upon and enact a coordinated prohibition on the purchase of shares of GME, AMC, and Additional Stocks by Plaintiffs.

105.    The Trading Platform Defendants subsequently banned the purchasing of the stocks in question while still allowing selling of the stocks.

106.    This constitutes an unreasonable restraint of trade as defined in the Cartwright act, via the conspiring to create or carry out restrictions in trade or commerce

18

107.    As a result of the unreasonable restraint of trade via the actions of Trading Platform Defendants, Plaintiffs have suffered injury via their inability to purchase new shares of stock in GME, AMC, and Additional Stock.

### Count IV

**Attempted Monopolization in Violation of the Cartwright Act**

**(Bus. & Prof. Code 16720 *et seq*.)**

**(Against All Trading Platform Defendants)**

108.    Plaintiffs re-allege and incorporate by reference the factual allegations set forth above.

109.    By prohibiting users to purchase stock in GME, AMC, and Additional Stocks, Trading Platform Defendants are partaking in exclusionary that is deleterious to consumers and to the anticompetitive benefit of the Trading Platform Defendants. Trading Platform Defendants engaged in and continue to engage in anticompetitive conduct.

110.    This conduct being orchestrated by multiple firms in concert constitutes a trust as defined in the Cartwright Act.

111.    Through this conduct constituting a trust under the Cartwright Act, Defendants have conspired to exclude Plaintiffs from the market as competitors for the purchase of GME, AMC, and Additional Stocks, and allow themselves the lion's share of the purchases. Trading Platform Defendants' coordinated prohibition of Plaintiffs' purchase of the Stocks demonstrates Defendants' specific intent to monopolize the stock market.

112.    Trading Platform Defendants' prohibition of purchases of GME, AMC, and Additional Stocks on their services places a massive restriction, as Trading Platform Defendants collectively control a majority of trading within the stock market. Trading Platform Defendants' coordinated conduct is likely to increase their market share and therefore poses a dangerous probability of achieving monopoly.

### Count V

**Breach of Contract**

113.    Plaintiffs hereby incorporate by reference the factual allegations set forth above.

114.    In order to use the Trading Platform Defendants' trading platform, a potential user must enter into the Customer Agreement with Trading Platform Defendants.

115.    Plaintiff and all class members did enter into a Customer Agreement with Defendants before beginning to use the service.

116.    Trading Platform Defendants breached its Customer Agreement by failing to disclose that its platform was going to arbitrarily restrict a security from being purchased on the app; that Trading Platform Defendants failed to provide adequate explanation to its users as to why the security was being pulled; that Trading Platform Defendants knowingly put their users at a disadvantage in the high-stakes and fast moving stock market compared to users who used other trading apps or services; that Trading Platform Defendants prohibited Plaintiffs from performing trades on the stock market in a timely manner (or at all) under the contract; that Trading Platform Defendants failed to comply with all applicable legal, regulatory, and licensing requirements in the running of a stock trading marketplace; and that Defendants failed to exercise trades and actions requested by users as is required under law.

117.    As such, Trading Platform Defendants breached its Customer Agreement with Plaintiffs.

118.    Trading Platform Defendants' failure to perform its duties and its breaches of the Customer Agreement resulted in damages and losses to Plaintiffs and exposes them to continuing harm due to Trading Platform Defendants' ongoing failure to perform its obligations under the Customer Agreement. These losses reflect damages to Plaintiffs in an amount to be determined at trial or separate proceedings as necessary.

## Count VI

### Breach of Implied Covenant of Good Faith & Fair Dealing

119.    Plaintiffs hereby incorporate by reference the factual allegations set forth above.

120.    Plaintiffs entered into the Customer Agreement with Trading Platform Defendants to open a trading account. They agreed to Trading Platform Defendants' Terms and Conditions in order to use Trading Platform Defendants' website and trading platform.

**CLASS ACTION COMPLAINT**

121.     Plaintiffs and members of the Class and Subclass fulfilled their obligations under these contracts by adhering to the agreed upon terms and by using Trading Platform Defendants' trading services through its website, app, and trading platform.

122.     Trading Platform Defendants was obligated to provide the trading services required under those contracts at all times, including but not limited to, trades for AMC and Additional Stocks.

123.     When initially signing up for Trading Platform Defendants, Plaintiff and all those similarly situated could and most actually did trade AMC and Additional Stocks.

124.     Trading Platform Defendants unfairly interfered with the rights of Plaintiffs and members of the Class and Subclass to receive the benefits of the Customer Agreement by, among other things, (i) failing to provide services necessary to timely execute a trade on the stock market; (ii) failing to allow its users to trade certain securities at all; (iii) failing to inform its users in a timely and effective manner of the drastic changes in trading abilities; and (iv) prohibiting plaintiffs from buying AMC and other stocks for Trading Platform Defendants' own pecuniary interest and not disclosing that interest to Plaintiffs and all Class and Subclass members.

125.     Trading Platform Defendants acted in bad faith by placing its interests, and the interests of its associates (Defendants Melvin and Citadel), over its contractual duties to its users.

126.     Trading Platform Defendants' conduct has caused Plaintiffs and members of the Class and Subclass harm, losses, and damages. These losses reflect damages to Plaintiffs and members of the Class and Subclass in an amount to be determined at trial or separate proceedings as necessary.

**Count VII**

**Negligence Per Se**

127.     Plaintiffs hereby incorporate by reference the factual allegations set forth above.

128.     Trading Platform Defendants had a duty to exercise reasonable care in conducting and facilitating transactions for its users.

129.     Trading Platform Defendants had a statutory duty to exercise reasonable care in providing trades on the free, open market for its users.

130.     Trading Platform Defendants unlawfully breached its statutory duties when it (i) restricted the purchases of AMC and Additional Stocks on its app; (ii) failed to provide its users

**CLASS ACTION COMPLAINT**

services related to AMC and Additional Stocks; (iii) failed to notify users in a timely manner of the AMC and Additional Stocks "blackout," or the total restriction of AMC and Additional Stocks purchases on its app.

131.    Trading Platform Defendants' conduct as set forth in this Complaint was devoid of even the most minimum level of care, and its acts and omissions were and continue to be an extreme departure from the ordinary standard of care. Their actions breach the duty of care to their users, but are also inconsistent with the standard of care expected from similar firms in the stock marketplace industry.

132.    Trading Platform Defendants completely disregarded the interests of its users by restricting their ability to purchase AMC and Additional Stocks, a breach of the standard of care that falls so far below normal conduct for a brokerage service that it amounts to a complete dereliction of its duties.

133.    Trading Platform Defendants not only violated the relevant statute, ordinance, or regulation but failed to do what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law.

134.    Trading Platform Defendants' grossly negligent and wrongful breaches of its duties owed to Plaintiffs and members of the Class and Subclass proximately caused losses and damages that would not have occurred but for Defendants' gross breach of its duty of due care. These losses reflect damages to Plaintiffs in an amount to be determined at trial or separate proceedings as necessary.

**Count VIII**

**Negligence [Cal. Civ. Code § 1714]**

135.    Plaintiffs hereby incorporate by reference the factual allegations set forth above. Trading Platform Defendants had a duty to exercise reasonable care in conducting and facilitating transactions for its users.

136.    Trading Platform Defendants had a common law duty to exercise reasonable care in providing trades on the free, open market for its users.

137.    Trading Platform Defendants unlawfully breached its common law duties when it (i) restricted the purchases of AMC and Additional Stocks on its app; (ii) failed to provide its users

services related to AMC and Additional Stocks; (iii) failed to notify users in a timely manner of the AMC and Additional Stocks "blackout," or the total restriction of AMC and Additional Stocks purchases on its app.

138.    Trading Platform Defendants' conduct as set forth in this Complaint was devoid of even the most minimum level of care, and its acts and omissions were and continue to be an extreme departure from the ordinary standard of care. Their actions breach the duty of care to their users, but are also inconsistent with the standard of care expected from similar firms in the stock marketplace industry.

139.    Trading Platform Defendants completely disregarded the interests of its users by restricting their ability to purchase AMC and Additional Stocks, a breach of the standard of care that falls so far below normal conduct for a brokerage service that it amounts to a complete dereliction of its duties.

140.    Trading Platform Defendants' grossly negligent and wrongful breaches of its duties owed to Plaintiffs and members of the Class and Subclass proximately caused losses and damages that would not have occurred but for Trading Platform Defendants' gross breach of its duty of due care. These losses reflect damages to Plaintiffs in an amount to be determined at trial or separate proceedings as necessary.

## Count IX

### Breach of Fiduciary Duty

141.    Plaintiff hereby incorporates by reference the factual allegations contained herein.

142.    As a licensed provider of financial services, Trading Platform Defendants at all times relevant was a fiduciary to Plaintiffs and owed them the highest level of good faith and integrity in the course of performing financial services on their behalf, services that include the buying and selling of stock. Trading Platform Defendants also acted as a fiduciary to all users who agreed to the Customer Agreement.

143.    Trading Platform Defendants breached its fiduciary duties to Plaintiffs by failing to disclose that it would restrict AMC and Additional Stocks purchases in a timely manner; actually restricting new purchases of AMC and Additional Stocks; restricting purchases of AMC and

23

1    Additional Stocks for its own pecuniary benefits; failing to provide access to its financial services in a

2    timely manner; failing to comply with all applicable legal, regulatory, and licensing requirements;

3    failing to exercise trades and actions requested by users in a complete and timely manner (also

4    required by FINRA § 5310).

5          144.    Trading Platform Defendants' conduct caused and continues to cause Plaintiffs harm,

6    losses, and damages. These losses reflect damages to Plaintiffs in an amount to be determined at trial

7    or separate proceedings as necessary.

8                                        **Count X**

9                                  **Constructive Fraud**

10         145.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

11         146.    Trading Platform Defendants owed Plaintiffs fiduciary duties as their broker for selling

12   securities.

13         147.    Trading Platform Defendants owed Plaintiffs the utmost duty of care as their fiduciary,

14   including the duty to fully disclose material facts relating to their brokerage relationship with

15   Defendants Melvin and Citadel.

16         148.    Trading Platform Defendants represented to Plaintiffs that it was a brokerage service

17   dedicated to free trading and democratizing the stock market.

18         149.    Plaintiffs chose Trading Platform Defendants as their brokerage service in part due to

19   Defendants' assurances that it was consumer friendly as a firm that allows open trading.

20         150.    Trading Platform Defendants subsequently restricted what Plaintiffs were able to buy

21   on their brokerage, contrary to their representations.

22         151.    Plaintiffs' reliance on Trading Platform Defendants' false representations were

23   substantial factors in causing Plaintiff harm, as they were unable to trade with freedom given Trading

24   Platform Defendants' restrictions.

25                                        **Count XI**

26   **Violation of California's Unfair Competition Law [Cal. Bus. & Prof. Code § 17200 et seq.]**

27         152.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

28

**CLASS ACTION COMPLAINT**

153.   California's Unfair Competition Law ("UCL") is designed to protect consumers from unlawful, fraudulent, and/or unfair business practices. Trading Platform Defendants' restrictions on the trade of securities within their respective apps and/or websites constitutes an unlawful business practice.

154.   **Unlawful Practices**: A practice is "unlawful" if it violates a law other than the UCL. Trading Platform Defendants violated Plaintiffs' common law and California statutory rights when it failed to provide complete trading services as to AMC and other stocks. Trading Platform Defendants' negligence, breach of contract, and breach of fiduciary duty made Plaintiffs unable to trade stock in AMC and Additional Stocks and lose out on massive potential gains.

155.   These violations of common and state as the predicate violations under the unlawful prong of the UCL, as Trading Platform Defendants created private causes of action against it by damaging the property rights of Plaintiffs via its unlawful conduct.

156.   **Fraudulent Practices**: A practice is "fraudulent" if members of the general public were or are likely to be deceived. Defendant Robinhood's messaging that it was an open platform and its mission to "democratize" trading is likely to deceive users into believing that they are truly open to purchase how they please on Defendant Robinhood's marketplace, when in fact Defendant Robinhood will arbitrarily restrict what stocks its users can purchase. Other Trading Platform Defendants similarly advertised their trading services as allowing users open and free trading opportunities.

157.   **Unfair Practices**: The UCL gives courts maximum discretion to address improper business practices that are "unfair." Trading Platform Defendants' business practices have become, and will continue to be, unfair because Defendants users were assured that they would be able to trade freely on the Trading Platform Defendants service and not have what stocks they were able to trade in be arbitrarily restricted at the potentially nebulous whims of Trading Platform Defendants. The gravity of the harm caused to Trading Platform Defendants users, such as Plaintiff, far outweighs any business reason, justification, or motive Trading Platform Defendants may have had for engaging in its unfair business practices.

158.   As a result of Trading Platform Defendants' unlawful, fraudulent, and/or unfair business practices, Plaintiffs suffered injury in fact and have lost a property interest in the values of

their stock portfolios given their inability to effectively purchase new stock on the Trading Platform Defendants' platform.

159.     Accordingly, Plaintiffs and the other Class members have suffered injury in fact including lost money or property as a result of Trading Platform Defendants' misconduct.

160.     Plaintiffs seek to enjoin further unlawful, unfair, and/or fraudulent acts or practices.

161.     Plaintiffs request that this Court enter such orders or judgments as may be necessary to enjoin Trading Platform Defendants from continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiff and members of the Class any money it acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code § 17203 and Cal. Bus. & Prof. Code § 3345; and for such other relief set forth below.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and the Class, demands a jury trial and prays for relief that this Court enter judgment in their favor and that of the Proposed Class and the proposed Subclass, as defined herein, and against Defendants as follows:

i.   Enter an immediate injunction requiring Trading Platform Defendants to fully reinstate AMC and all the other stocks it restricted in the announcement on January 28, 2021 on their trading platform;

ii.   Restrain Trading Platform Defendants, their officers, agents, servants, employees, attorneys, and those in active concert or participation with them, from the continued and unauthorized restriction of trading ability of the Plaintiff and Proposed Class and proposed subclasses, as defined herein;

iii.   Certify the Proposed Class as well as any suitable subclasses, under Fed. R. Civ. P. 23;

iv.   Appoint Plaintiff and their legal counsel as both named representatives for the Proposed Class (or for any suitable subclasses), and as Class Counsel, respectively;

v.   Award Plaintiffs and the Proposed Class (or any suitable subclass): (i) actual, compensatory, and consequential damages, (ii) punitive and treble damages, as allowed for under the relevant laws, (iii) restitution, disgorgement, reimbursement, and/or other equitable relief as the Court

1   deems just and proper, (iv) costs, including experts' fees and attorneys' fees and expenses, and

2   any other reasonable costs, and (v) pre- and post-judgment interest, to the extent allowed

3   under the relevant laws;

4   vi.   For any such other and additional relief that this Court should deem as just and proper.

5

6                              **JURY DEMAND**

7   Plaintiffs respectfully demand a trial by jury of all matters so triable.

8

9

10  Dated:  <u>February 2, 2021</u>                          Respectfully submitted,

11

12                                             <u>*s/ William M. Audet*</u>
                                               William M. Audet (SBN 117456)

13                                             waudet@audetlaw.com
                                               "David" Ling Y. Kuang (SBN 296873)

14                                             lkuang@audetlaw.com
                                               Kurt D. Kessler (SBN 327334)

15                                             kkessler@audetlaw.com

16                                             **AUDET & PARTNERS, LLP**

17                                             711 Van Ness Avenue, Suite 500
                                               San Francisco, CA 94102-3275

18                                             Telephone:    (415) 568-2555

19                                             Facsimile:    (415) 568-2556

20                                             Robert L. Lieff (SBN 037568)

21                                             rlieff@lchb.com

22                                             275 Battery Street, 29th Floor
                                               San Francisco, CA 94111-3339

23                                             Telephone:    (415) 956-1000
                                               Facsimile:    (415) 956-1008

24

25                                             Jack Russo (SBN 096068)

26                                             jrusso@computerlaw.com
                                               **COMPUTER LAW GROUP, LLP**

27                                             401 Florence Street
                                               Palo Alto, CA 94301

28                                             Telephone:    (650) 327-9800
                                               Facsimile:    (650) 618-1863

                                               27
                              **CLASS ACTION COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Attorneys for Plaintiff Elvia Curiel-Ruth, on*
*behalf of herself and all others similarly situated*

**CLASS ACTION COMPLAINT**